Good morning, Your Honors, and may it please the Court, I'd like to please reserve three minutes for rebuttal time. This case involves the Illinois Biometric Information Privacy Act, Section 15B of which states that no private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information. The District Court, in granting summary judgment in favor of Facebook here, erred by creating a judicial exception to the plain language of this statute and carving out, writing out persons from the coverage of the statute. Mr. Counsel, I wanted to ask you about that because I think your point is well taken that the statute does say persons. They argue, and we'll hear from Meta, but they argue that this is a strawman argument because I don't think their argument hinges on the fact that it just didn't apply. They're saying, like on its terms, it doesn't apply to non-users. They're saying we just didn't violate the statute. And so, I mean, I guess I'm wondering, do you actually win the case if we say, oh, yeah, well, Section 15B does apply to non-users? Isn't there a lot more we still have to figure out? Your Honor, Facebook is raising arguments in this appeal that the District Court did not rule in their favor on. The District Court's decision— But we can affirm the District Court for alternative, on an alternative basis. This is coming up on summary judgment, right? Or, well— It's an appeal from a grant of summary judgment. Yeah. They moved for summary judgment on multiple grounds. All of those grounds were denied except one ground, which is this judicial exception that the judge created, where he read out the word persons and limited the application of BIPA to just people with preexisting relationships with the defendant. We submit that that is clearly in contrast and contradiction to the plain language extension. Okay. I think I agree with you. I think I agree with you. But I don't think you win based on that. You still have to show that they violated the statute as to non-users. And that's what I'm struggling with is, you know, is there a material dispute here? Because what is your basis for how they violated the statute as to non-users? Because their argument seems to be we don't have any information that could identify a non-user. The data we have is a bunch of code. We run it against—if it matches up to a Facebook user, we flag it. They can be tagged. If it doesn't match up, it's not like they could look out and say—I mean, if I were not on Facebook, they could not use that information to come and identify me as an individual. Do I have the facts wrong in my understanding? Yes, you do, Your Honor. Their characterization of the factual record on those issues is an overstatement of what the records are. So I'm not wrong in the arguments they're making. You're saying there's a factual dispute that proves there's a dispute about whether that's accurate or not. Not only am I saying that, the district court explicitly said in the summary judgment decision that there were quintessential factual disputes on all of those contentions. I understand. And the district court may have been correct, and it may not have been correct on those issues. So I want to know what are the facts that suggest that the data that they're collecting as to non-users— or, well, I say collecting. I've got to be careful. I don't want to suggest that I'm saying collecting in the sense of violating the statute. But the data that they have as to non-users, what is your evidence in the record that shows there's a dispute about whether that can be used to identify a non-user? I just want to be clear, Your Honor, this question that you've posed, and I'm happy to answer it, and I will momentarily. It is not what the district court ruled on. I understand that. But we can affirm based on any reason in the record. So I want to know whether we can affirm on this basis to say that the district court was wrong in finding a factual dispute on this issue. So tell me what the factual dispute is that a non-user could be identified with the information that they collect. Okay. So they raise two arguments here. One is that the information that they obtain is not a—doesn't count as a biometric identifier. That's number one. Number two, they say whatever it is, we didn't keep it long enough, and therefore it shouldn't count. Okay? Those are the two arguments that they make on these factual disputes, which, again, the district court found to be a dispute. And so let's go to the first argument because my understanding on the first argument, and I'm sorry to ask the question, but in my mind this is pretty complicated. I mean this is not intuitive as to what the definition of biometric information or biometric identifiers are. But as I boil it down, it seems to me that it has to be data that can identify somebody. Okay. Am I wrong about that? Well, let me answer it this way. Maybe you are, in a sense, but maybe not. It depends on the— Okay, biometric information. Let's start with basics, okay? Yes. The definition of biometric information is any information, regardless of how it is captured, converted, stored, or shared. We've got a separate issue there. Are you talking about information or identifying? I'm talking about information. Right. If it's based on an individual's biometric identifier used to identify an individual, doesn't that suggest that this information has to be able to be used to identify an individual? That biometric information definition does contain the qualifier used to identify. But that's not what the case is about. If they've led you to believe that, Your Honor, they've misled you because the contention is the other definition, biometric identifier. Oh, biometric identifier. Which does not contain that language. Specific types of data, which include retina or iris scan, fingerprints, voice prints, or scan of hand or face geometry. And you're arguing this is face geometry. Yes. And there is no additional language, like there is in the biometric information definition, where in that latter definition, it adds the qualifier used to identify. The biometric identifier definition doesn't have that additional condition to it. All it has to be is one of the listed things. And what happened here is Facebook creates a scan of face geometry from every photo of a face that is uploaded to their system, during the relevant time period. So that qualifies as a scan of face geometry. And this Court actually had no problem concluding that exact same fact in the Patel case, which involved the exact same technology. In fact, if you look at the background discussion in the Patel case, in page 1268 of this Court's opinion in Patel, where it's talking about the Facebook facial recognition technology, it says it makes the face scan from the uploaded photos. It creates first what it calls a face signature. This is Facebook's terminology. The face signature, this Court said was a scan of face geometry. That's what we have here. And they don't dispute that. The green that we create. Mr. Carey, is there a difference in the Facebook case where that information, which involved users, was held on to? And Facebook here is saying it's not a violation of the statute. If you read, I read this as a statutory construction argument, that BIPPA does not create a cause of action for information that's temporarily grabbed in order to see if there's a match, and then delete it. And so I think that's a distinction that Facebook is drawing between this case and the other case. Why are they wrong in your view? Well, they're wrong on the law, and they're wrong on the facts of this particular case. So let me start with the facts, but I could start with either one. Start with the law. I think I'm more interested in your interpretation of the statute. Okay. There is no temporal requirement in the statute for how long you have to keep something in order for there to be a violation. They are trying to write that caveat into the statute. They are trying to engage in more judicial lawmaking. Well, I don't know. I mean, if you look at 15A, it talks about in possession of, and needing a written policy in order to either retain or destroy that information. And there are other provisions as well that talk about possession. And as I take their argument, when you the words collect, capture, or obtain, involves some sort of possession of that data and then misuse of it. So why is that incorrect? It's interesting, Your Honor. They devote some discussion in their brief as to what they suggest, how they think the word. So you just mentioned 15A, which talks about possession of biometric identifiers. That 15A triggers the duty to publish a retention schedule. That's a different section of the law than 15B, which is the getting the biometric identifier violation. Okay? So let's just focus on the getting the information, because that's what we're talking about here. I believe that was Judge Nelson's question. So that one prohibits collection, capture, or otherwise obtain. Those are key words in the statute. They devote — it's interesting. They conveniently try to define and ask this Court to construe what they think the meaning of collect and capture should be. And their definitions have an undercurrent of holding onto it for a while, you know, for lack of a better term. They don't define anywhere in their briefs otherwise obtain, which is broader than collect and capture by its nature. And if you look — and they want to rely on Merriam-Webster dictionary definitions for collection and capture. That's what they're citing to you in their section of the brief on what those terms should mean. The Merriam-Webster dictionary definition of obtain is to gain or attain, A-T-T-A-I-N, usually by planned action or effort. There's nothing in — like when they define capture for you, they give you a definition that says recorded in a file. Well, let me ask this. But obtain doesn't have that. Let me ask this. It just means to attain. Do you mind if I interrupt you? The district court thought that it would be absurd to construe the statute in a way that would require Facebook to try to obtain the consent of millions of non-users in the state of Illinois. And I think this connects a little bit to the question I've been asking because if you don't construe the statute in a way that has some sort of holding onto it or possessing it, why was the district court wrong to think that it would be absurd to require a company to go and try to obtain the consent of all these non-users? Well, a couple of things there, Judge. And before I — let me make one other comment here. The district court — we're getting back now with this question to the district court's rationale, which is the imposition of the new requirement that the statute is limited to people who have a preexisting relationship with the defendant. Therefore, people that the defendant doesn't know who they are, the statute can't apply to them. That's what the district court said. That's wrong because it reads out the plain words of 15B, which is any person or customer. Any person or customer obviously is more than a customer or a user or someone with a preexisting relationship. Otherwise, the term any person would be completely superfluous. So we can't do that. That would be — that decision from the district court and what they're continuing to urge here is wrong. On the — I want the court to understand that on the facts of the storage, they have a footnote in their brief that — so they say what they do is the photos get uploaded. They create face signatures of everybody. They run the face signatures against their database of what they call face templates for users. And if there's a match, they suggest a tag. You can tag a friend. They admit in their brief that the system isn't perfect, that sometimes non-user faces for which they create scans of face geometry called face signatures are matched to people that are users by mistake. And guess what happens in that scenario? Because there's a match, they're converted into face templates. And they keep those for however long they keep them. And this court in Patel even talked about face — dealing with the same technology, identified face templates as being face signatures that are matched. Can you point me to the evidence in the record that supports what you're just saying? Yes. And I'm going to make one more point, and then I'm going to give you the citations, Judge. Mr. Clayton Zellmer, my client's face signature was one of the ones that was matched to a user and converted into a face template. Please, give me that. Because all I read was we had four face templates of your client between 2013 and 2020. I did not get this nuance that you're now saying that they stored those for some lengthy period of time. Okay. At supplemental excerpts of record 37, supplemental excerpts of record 126 and 127. Those passages — that's a citation to Facebook's summary judgment motion and their deposition transcript of their expert, who stated that one of the four Clayton Zellmer photos was matched to a Facebook user. And we know from other parts of the record that when a face signature is matched, that's how we get face templates. That's what I'm asking for. I think we're missing a link here. And this is key because you have to show a material fact, a dispute of fact. And I'm not — you've said a lot of things, but we need to be able to trace this back in the record. And I'm not sure I see that connection that — I mean, you're combining, like, two different pieces of information. You're saying he matched four times. No. They took his face scan four times. Okay. How many times did he match? And they created four face signatures from those four scans. Okay. I understand that. One of those four was matched. Okay. So one of those matched. And when it matches, where's the — where's in the record that it says that when they match, even if it's an incorrect match, they hold onto that data? Okay. At supplemental excerpts of record 42 to 43, they say that for non-users where face signatures are not matched, they do not store them as face templates. Okay? So for face signatures that do match — You're saying by implication. Well, I'm not only saying it. I've got another reference for you, Your Honor. It's Patel at page 1268. This court in Patel addressing this same technology defined a face template as a face signature that was matched. So what happens is they first create the face signatures, and if there are matches, they convert the face signature and save it as a face template. And they have one of those for my client. Counsel, the problem with your argument that I'm having is that the match was a mismatch. And that's in the record. I read the expert report this morning. That's in the record. They knew it was a mismatch because Mr. Zilmer was matched to a woman user. That's correct. You're absolutely right. And they knew it right away. So we come back to face identifier and, you know, matching to the actual plaintiff who's upset. It's a mismatch. And if it's never going to be — if there's no templates of non-users, it's never going to match correctly. Well, Your Honor, face scans, by the definition of biometric identifier, inherently are identifiers. They don't have to actually be used to find somebody yet, just like a fingerprint drawn in a crime scene. Counsel, stop. You need to stop talking over the judges. I'm sorry. The way I understand what has been presented to us is that these signatures, which are something less than a template, can be used to eliminate, but they don't actually affirmatively match for non-users. Why is that not true? The face scans do — they are face scans. They are scans of face geometry of non-users and users, and they qualify as biometric identifiers under the statute as scans of face geometry. And that fact was acknowledged in the court's prior Patel decision. And because they are face scans, they inherently can be used to identify whosever face it is. Does the defendant actually have to go and track it down at a particular moment in time for it to count as a biometric identifier? No. It just has to be capable of identifying somebody, just like a fingerprint taken from a potential suspect at a crime scene. We haven't matched it yet. It's still an identifier for that suspect. I see that I'm into my rebuttal time now. Yeah. We'll give you some time for rebuttal. Thank you, Your Honor. Thank you. Good morning. May it please the Court, Lauren Goldman for Defendant Facebook. BIPA is a very stringent statute. Our client paid $650 million in Patel to settle the claims brought by users asserting that Facebook didn't obtain the necessary informed consent before storing their templates. But even BIPA has limits, and this case is outside those limits. There is – sorry, Your Honor. Well, I just want to know what's on the table here. Right. Understood. Are you arguing that non-users are just not covered by BIPA at all? Absolutely not. That's what I thought. That's what I thought. That's what I thought. So if we write in our opinion in one paragraph and say it clearly applies to persons, you're not going to dispute that point. You're making a more nuanced argument, as I understand it. We are making a more narrow argument. Let me make clear what we argued below and what we're arguing here and what I actually think Judge Donato held, although the court, of course, can affirm on any ground, as the court has observed. The way that we framed this below is it's excerpted at page 30 of our appellate brief. There's a block quote. And we said we're not saying that BIPA doesn't apply to any claim brought by a non-user. What we're saying is that BIPA doesn't apply to the incidental processing of a non-user in the course of recognizing an enrolled and consenting user. That's the narrow rule that we asked for below and that we are asking for in appeal. And what's your statutory basis for that reading? Because it's not from person, right? You agree that it's not in the use of the word person or customer. So where does that come from? It's in two places, Your Honor. To just pause on person for a second, person doesn't mean any person, any time, in any circumstances. It doesn't mean a person walking past a security camera that's out in front of a school. Person can mean a user. It can mean a customer. It can mean an employee. Most BIPA cases are brought by employees who are not customers. So person can have a meaning that is less than every person in Illinois. But in terms of the statutory hook, I would direct the Court to two provisions. The first is Section 5 of the statute, which is written right into the text and makes it very clear that what the legislature was doing here was regulating biometric technologies. It was not banning them, as the Supreme Court of Illinois and the Seventh Circuit have repeatedly observed. And now Mr. Zelmer admits that his proposed rule will constitute a ban on all biometric identifying technologies. But the other hook that the Court is probably more interested in is right in 15b, which is the operative provision here, because 15b talks about the collection and capture of biometric identifiers and biometric information. This statute protects two interests. There have been, I don't know, hundreds of BIPA opinions, right? They all talk about two things. They talk about privacy, and they talk about identity theft. The incidental processing of a nonuser, when that data is indisputably, and we can get to the record on that, deleted immediately if there is no match, it doesn't invoke those things. And as the Court was getting at with the Court's questions about what identifier means and what biometric information means and what collecting capture means, 15b doesn't apply here. So that's where my hang-up is, because it seems to me that that's clear as to biometric information. Right. There is a hook that they have to be able to be identified. But then there is also the statute does say you cannot collect or capture. We've got a separate issue about whether it's collect or capture. But whether biometric identifiers, and identifiers is just, I mean, I guess your position would be you could have a whole database of biometric information, but as long as it could never be used to identify anybody, it wouldn't be violated. Okay. Tell me what. Well, because you have to. It's necessary to read the different provisions. We are not. That is not this case, right? This is not the Orwellian database case. We are not saying that it is perfectly fine to go out and collect face signatures for lots of strangers and save them. So if you held on to these non-user templates for a lengthy period of time, you would agree that would be a violation? No. I'm not conceding that. I'm just saying that's not this case, because we didn't do that. Right? I mean, that Orwellian data, and in fact. No, but that's what, I mean, it seems to me we have to give some meaning to identifier that's different than information. Yes. How do we do that? Thank you, Your Honor. Let me address that. So the court, BIFA works in an interesting way. Okay? So what the legislature did is it said, we're going to regulate these six things, iris scan, retina scan, scan of face geometry, fingerprint, voice print. We're going to regulate those things. Those things, we're going to call them biometric identifiers. Then, if you take one of those things and you turn it into derivative data, like you turn it into a number, you take a fingerprint and you turn it into a number, we want to make clear that that's still regulated. So that's biometric information. But what the courts have said about the term biometric identifier is that it's still something that needs to identify a person. Well, can I push back a little bit? Because it's converted as one of the words in biometric information, but it's also stored or shared regardless of how it's captured. So it's more than just conversion of the data. It could be what Judge Nelson was referring to as the storage of a bunch of biometric identifiers. No, because of the words derived from. Right? a biometric identifier and can be used to identify an individual. The reason why the legislature didn't have to make clear in the term biometric identifier that that, too, had to be something that identified a person is that it's right there in the name, biometric identifier. Well, maybe not only that. I mean, I'm not sure that this is near as complicated as we're talking about it. I mean, all the things listed under biometric identifier can identify a person. Correct, Your Honor. A person, a fingerprint, a voice, a face. Correct, Your Honor. Is it just that simple? It is. I mean, this case is simple and narrow. You can get at it from any one of these ways, right? You can get at this case from a super common sense point of view that if the legislature wanted to ban biometric technologies, it would have written a much shorter statute. It would have said biometric technologies are hereby banned in the state of Illinois except for police forces and public schools. It didn't do that. It wrote this very sort of nuanced statute. And Mr. Zelmer, as we talked about, has admitted that if you have a rule that a company can't try to match a face to a database, that pertains to how all of these systems work. That's why we had this amicus brief from the Security Industry Association. They don't care about tag suggestions. They're concerned that all of these useful security applications of biometrics would be outlawed in Illinois if a security camera outside a school, if the school were liable to passersby for checking their faces against an enrolled database and then dumping the data. So that's one way to get at this. I want to focus in a little bit on the issue that I'm struggling with the most, I think, and that is trying to understand, and this relates to some of Judge Nelson's questions, I think, about the technology and whether we have a dispute of fact or just a dispute of law with regard to these facial signatures and can signatures themselves be used to identify someone or not. We do not have any disputes of fact. I'm happy to walk through both of the things that Judge Donato talked about. First, on face signatures, there was no dispute, actually, of fact. We walked through this in our brief and we gave the record sites there, but there was no dispute that, A, Facebook could not and did not identify non-users with the face signatures. Judge Donato actually found that that's all over pages five to seven of his opinion, that it was impossible for Facebook to identify these people because there was no match to a saved template. What the judge said, which is actually not true on the record, is that there was a dispute about whether Facebook's face signatures were interoperable. In other words, if Facebook had given them to some other company, that other company could potentially have used them to match to somebody who was enrolled in their database. There was no dispute of fact on that. Judge Donato pointed to two statements from the same witness, the second one of which didn't address interoperability. So there was no dispute on that. But on the main point – Hold back up. There was no dispute that that couldn't be done or that that wasn't being done? It definitely wasn't being done. Right. Mr. Zellmer has never alleged that that was ever done. I understand that. And Judge Donato didn't find that it was ever done. Right. I understand that. But it could – I mean, it does raise an interesting question because if you – I mean, this is one thing I – like, say there were some global database out there. Like, right now, Facebook, they only have the data on their users. They run it against their user. Say there was a global database where you could run it through that and it would capture non-users. Would that change this case? Because then those non-user templates presumably could be used to identify a non-user. I know that that's not here, but I got to get this in my head because I don't understand where the limits are here. Right. I think that plays into – so if I'm understanding the court correctly, the question is – I think this actually is addressed by the two cases that we cited as supplemental authority, which both hold that in order – The district court opinions. The district court opinions, but they're from Illinois and they're useful in terms of thinking about this. In order for something to be a biometric identifier, the defendant has to be able to identify the person. It really can't – through Google and you could find it. Now, Facebook says, we didn't do that. We don't intend to do that. What if they could? Would that make this then a biometric – would it turn this biometric identifier into biometric information? Because with the click of a button, presumably you could run it through another database. I think it would be possible that if Facebook could collect face signatures that it could match to a database that it had access to, that might make it a biometric identifier, but still plaintiff wouldn't win. First of all, those are not our facts. But second, plaintiff wouldn't win, right? Because then plaintiff would have a second problem, which is that Facebook would have to do this in a way that would constitute collect, capture, or otherwise obtain. Right, which then we come back to the ephemeral collection issue. Right. Can you address this issue? Yes. Is the – do you – can you walk me through what the evidence says about when there were four face signatures created of Mr. Zellmer? You agree with that, right? Yes. Between 2010 and 2022 or whatever it was. Yes. One of those apparently matched incorrectly to a female user. What happened to that face signature? It was still dumped. It was still dumped. It was still dumped. So the implication – and this is what I was getting at, and I was pushing back, because the implication from the evidence he's reading is, well, they only said they dumped it when it didn't match. What about when it does match? So where in the record does it say that that was dumped? Okay. So I want to point the court to SCR 110.111. Okay? So this is testimony from Mr. McCoy, who is a Facebook engineer who was in charge of text gestures. And he testifies at 110, face signatures are not saved or stored. They exist only briefly during the next step of the process, classification, and are immediately discarded. At 111, he testifies the comparison process during which face signatures exist takes only a tiny fraction of a second to complete. The comparison between a face signature and a template is performed in a few clock cycles of the CPU, which lasts just a few nanoseconds. And at 134.35, his deposition, he says – he's asked, how long does a face signature exist? Oh, like very, very tiny fractions of a second. Once we're done with it, we toss it, we discard it. There is no face signature for Mr. Zellmer that was ever – Even the one that – Even the one – no. Can I clarify that for a second? Because everything that you described is about if there is no match. But I take – Even if there is a match. So where in the record does it support that even if there's a mismatch, that data will be dumped? I believe that in the expert testimony that the court was referring to, that Judge Forrest was referring to, he just said all that was saved was this erroneous tag. So what happened was that somebody else – there was a match to another user. That other user was tagged – a tag was suggested for that other user who was a woman in that photo. Nothing was saved about Mr. Zellmer. No Mr. Zellmer's facial scan is not saved because of this mismatch? No, no. There was no face signature for Mr. Zellmer that was saved. And so to rule in your favor, do we have to find that the nanosecond holding is not a collection or a capture or otherwise obtaining? No, because I think that the court could find, as Judge Donato did, that it just simply doesn't apply to this. But yes, the court could also find – and it's not about the nanosecond. He said it didn't apply because it would be absurd to say you have to go get consent and therefore he kind of read out – I'm actually struggling with that aspect of Donato's opinion. So that's why I'm looking to say – Understood. If I don't agree with that, then we do have to squarely find that the nanosecond, whatever it is, does not constitute capture. Because if it did constitute capture, then we'd have a problem, right? I don't think so, Your Honor, because there are all these alternative arguments that we're making here. But I just want to point the court to a couple of cases on what constitutes – I guess you're – The Illinois courts are – Okay. And the other argument is it could never be used to identify, and so therefore – Correct. Okay. Yeah. And that the Illinois legislature – So if we drop that argument and say it could never be used to identify, then we don't have to get into the collection issue. We just say it doesn't – it's not covered by the statute because of that. You could do it that way, or you could – I want to point the court – because it's not really about nanoseconds. I mean, nanoseconds is a great way to think about this because it was dumped after nanoseconds. That point isn't disputed. Well, I'm just going based on what the expert said. I mean, I don't know. I don't know if he ever timed it. I don't know if we have timers for nanoseconds, but – They did. It was a couple of turns of the CPU, Mr. McCoy said. But I want to get back to why it's not just about nanoseconds. The Illinois courts – we cited the Barnett case and the Hurd case for what collect and capture mean in this context, and I know I'm out of time and over. This is helpful. You can always be helpful to the court. Okay. Thank you, Your Honor. The Barnett case and the Hurd case explain that collect and capture in 15B and possess in 15A connote something more than just the ephemeral existence of something. What they connote is a degree of control. Intentional – or, well – Intentionality and control. They say it involves – What about otherwise obtain? He points to that language as well. Right. So courts have held that otherwise obtain, when you have it in a list of things like collect and capture, has to be read – Has to derive from those basic – It has to be – it can't just be and everything else, right? It has to be read in the context of those other words, which have a very specific meaning. So on that point, Your Honor, I would point the court to the Barnett and Hurd cases. Barnett is from the Illinois Appellate Court. Can I ask – so I've wrestled a little bit with your argument that the data has to be used to identify for biometric identifiers. I get the point that this data is capable of identification, right? As Judge Forrest mentioned, fingerprints, voice – those are unique characteristics of a body that is capable of identifying a person. But your argument seems to be that if Facebook doesn't at the moment have the capacity to identify a nonuser, it's therefore not a biometric identifier. And my concern is couldn't there be a claim made about the misuse of biometric identifiers in some other way, even if Facebook can't identify them right then and there, such as collecting that data or selling it to a third party and someone else can go and identify the nonuser because they happen to have the information in their database. Why wouldn't that be an actionable claim under BIPA? Well, those would be other provisions of the statute, right? Sections 15C and 15D talk about transferring of biometric identifiers. But in this situation, a face signature, which is this ephemeral thing that Facebook can't use to identify anybody, is just not a biometric identifier within the meaning of the statute. Mr. Zellmer's argument is that it is because literally – and I would dispute this. This is something that would have gone to a jury. This is the one jury point in the whole case. We would dispute whether a face signature even is a scan of face geometry, but putting that to one side, even assuming that it is, what the Illinois courts have said over and over again, and I would point the court to the Rivera decision on this, is that you can't just say something's literally a scan of face geometry. You have to say, okay, but is it a biometric identifier? And if it can't be used to identify, then it's not a biometric identifier. But if that same face scan happens to be matched to a user, then you can't identify the facial scan. Is that a yes? No. Then you can identify the user, but the thing that's actually the biometric identifier is the saved template that's associated with an actual person's identity. That's frankly why the users had a much stronger claim. Judge Donato defined the class in the user case as people who had stored templates. He said it's the store, and the users in that case claimed that it was the stored template that was a biometric identifier because it was associated with their Facebook profile. It was associated with them and identified them. This is a question I have related to that. Can you take a face signature and with only the information in that signature create a template? No, because a template is actually something else entirely. A template is something, it's a hyperplane that analyzes. Oh, that clarifies it. Thank you. You can't, a template is something that is saved and stored, and it is constructed analyzing multiple face signatures from the same person. That's the definition of it. That's in Dr. Turk's report, but it's outside the bounds, I think, of this particular appeal. You're putting it in sort of very low-level common speak. You need something more. You need more data, more information than what is contained in a signature. You have to know who it belongs to. Fundamentally, Your Honor, that was the problem here, is that there's no dispute that Facebook didn't know who it belonged to because it didn't know who Mr. Zelmer was. And that's why it wasn't a biometric identifier, because it couldn't be used to identify him. And there's nothing in the record here. I guess that argument, I'm not quite sure that that part of the argument makes sense, because if you had a template, for whatever reason, if Facebook had a template of a non-user, and then that non-user gets uploaded in a picture of a user, you can match and you can identify that person. Why wouldn't that be true? This is not a class action, though. If you had a template for a non-user, sure. So that's what I'm just saying. As a matter of technology, if you actually had a template of a non-user, you could be identifying non-users. You don't have to have the template that is associated in an account, like this account holder, here's his name and here's his e-mail and here's his phone number and here's his template. You don't have to have all of that organized in such a way. If you have a template and that person ever shows up in some sort of photo in the system, you can do a match with that information. If you saved a template from them and knew who they were, sure, had some way of figuring out who they were. That's why I'm asking, is the signature, if the information in the signature can be used to create the template, then I think your argument is weaker. But your response to that is whatever is in the signature is not enough to make the template. But not by itself, Your Honor. I have tons of questions, but we better let you sit down. Thank you. I very much appreciate the Court's time. Thank you. Yeah, is that what he has left, is two and a half? Oh, you gave extra time. Oh, yeah, yeah, give him three minutes. Thank you very much, Your Honor. A few points right off the bat. I want to push back on the commentary that was given to the Court about face signatures and what they are and what was done with them here. The citations that were given to the Court a few moments ago by opposing counsel to supplemental excerpts of Record 110 and 11, that discussion relates exclusively to face signatures, not face templates, face signatures only. The question had been, do you keep anything? Did you keep anything of Mr. Zellmer's? And the citation to what is done with face signatures doesn't answer that question because here the face signature was converted to a face template. And they said that that's what happens to face signatures. They said it in the citations that I read earlier. And in Patel, a very succinct one sentence I can read to the Court, what was said in that case at page 1268, the technology extracts the various geometric data points that make a face unique, such as the distance between eyes, nose, and ears to create a face signature. So right there, the Court in Patel is acknowledging that a face signature is a scan of face geometry. And the decision goes on to further note, the technology then compares the face signatures to faces in Facebook's database of face templates, i.e., face templates, i.e., face signatures that have been matched to profiles. And then if you look at the other citations I gave earlier, the evidence that we've got here is that face signatures are created off of every photo uploaded, whether user or non-user. The comparison is run to the database of other stored templates for known users. And then if a match is created, the signature is converted to a face template. That's their language in their motion to dismiss. And the signatures are thrown out if there's no match. So that's what happens. So in that one photo of Mr. Zelmer in this case, where his signature was created, and by the way, that alone is a scan of face geometry that qualifies as a biometric identifier. But beyond that, if we want to get into this ephemeral defense, that signature was converted in that one instance at a minimum into a template that was kept. Now, it turned out to be a mismatch. The system didn't even know it was a mismatch until this case. Otherwise, how would they go back and find out that it was a woman? They obviously had the information still there. So we later found out it was a mismatch. But they create these mismatches on who knows how they characterize it as rare. But one out of four, perhaps it's not that rare. The second point I want to make, the legal argument being put forward here, is they want a new exception. Judge Donato granted the exception that I'm only going to apply BIPA to less than all persons, to persons who have a preexisting relationship with the defendant. And since that's recognized to be a faulty argument by everyone, I believe, the new argument is we want a different exception now. We want an exception that says, well, BIPA Section 15B says nobody can obtain a biometric identifier or biometric information without consent. And this is the caveat that they want. Except if it's in the process of incidental processing of some comparative data. That incidental processing exception is a new exception, which isn't in the statute, could have been written into the statute, but it's not there. And it's not for the court to— Well, I think the argument that Facebook is making is if you don't read it that way, then you destroy an entire technology beyond just this case. And that the legislative findings indicated, and Judge Donato mentioned this as well, that the law was intended to regulate, not eliminate, you know, these applications. So why is that a crazy way to read it? Well, nobody's asking for a ban. They could have always limited the system to users who consented. But by applying the face scanning technology— I'm not sure that's actually true, because you wouldn't know whether it's a user who consented until after you ran. Well, they could have prompted a user to confirm that before uploading a photo. So then you could only upload photos that were of users. No, they're yours. You could never upload a photo of me and my family, and then four of my family are Facebook users and one isn't. I couldn't upload that photo. That's true, because Illinois has made a legislative decision to give people, individuals, control over the collection and use of their biometrics. And if you can't get their consent, the statute is to promote the consensual use of biometrics, not the indiscriminate use of it here. And they're not a security company. And they're not a company that— Well, but the analogy would apply the same there. That's the problem. No, it doesn't really. This isn't a security screening case. The statute has legislative— Well, yeah, but now you're just saying, oh, well, we're not going to read this exception in, but we're going to go ahead and read a security screening case exception in. That's not this case. This is about— But we've got to interpret this in a way. We've got to be mindful of how to— Look, however difficult this case is, and maybe it's not at the end of the day, it's going to get more complicated. I mean, the technology is going to increase, and so we've got to get this right. I would submit, Your Honors, that the statute, as clearly written, should be enforced and applied. If there needs to be exceptions, if there are reasonable exceptions that could be drawn, the legislature is the place to go for that, not the court of law. And as to the facts, I believe we've shown that the facts where all inferences should be drawn in our favor are sufficient. I don't believe that this court should substitute its judgment for Judge Donato's, who found—who's very familiar with the technology after having presided over the prior Facebook case and detailed record in this case. I don't believe that the court should take Facebook's invitation to overrule Judge Donato's conclusion that there was not enough factual development to make these factual findings. Okay. So thank you. We have your argument. Thank you. Thank you very much. Thank you to both counsel for your arguments in the case. The case is now submitted.
judges: NELSON, FORREST, SANCHEZ